## OTTO BEALL *v.* ELEANOR WARD.

[No. 20, January Term, 1930.]

*Decided March 12th, 1930.*

648

The cause was argued before Bond, C. J., Pattison, Adkins, Offutt, Digges, and Sloan, JJ.

*John Wood* and *Samuel A. Lewis,* with whom was *Edward O. Weant* on the brief, for the appellant.

*Guy W. Steele,* with whom, was *D. Princeton Buckey* on the brief, for the appellee.

ADKINS, J., delivered the opinion of the Court.

This suit grew out of a collision on March 24th, 1928, between the automobile of appellee, an Essex coupe, and the motor truck of appellant, operated by one Mehrle Warehime, on the state road leading from Westminster to Baltimore. There was with him a helper named Weddle; and riding with her was a man whom she had picked up on the road, and who was instantly killed by the impact. Appellee was going in a westerly direction from Finksburg towards Westminster and the truck was going easterly towards Baltimore. The collision occurred in front of a farm known as Miller's Farm, about three miles east of Westminster. The turnpike road is sixty-six feet wide, improved by a fourteen-foot macadam road with concrete shoulders three feet wide on each side. East of Miller's entrance, on the south side of the road, there is twelve feet of dirt road, which narrows to about eight feet west of the entrance, of which a gutter one foot deep occupies about two feet. Appellant's witnesses say there were trees on a bank beyond the gutter. There were only four persons who saw the collision; one of them at the time of the trial was dead; appellee, who was the plaintiff below, did not undertake to describe the collision because, she said, she had no recollection of how it occurred. Her physician testified that this defect of memory was a natural result of shock and the injury she received. So defendant's employees alone testified as to the occurrences at the moment of the collision. Warehime testified that he was on his right side going towards Baltimore.

"Q. Now just tell the jury the way it was, what happened after you got to the crest of the hill before you descend? A. I was going down then and got down there, I just don't know how far and seen a car coming up the road in the center of the road, and further down the car edged over on my side. So I blowed down on my horn once or twice, no more, and I seen she was coming on, I thought 'well nobody is making any move,' I thought 'the best thing for me to do is to try to cut around it,' and of course I started to go around her and

she threw up her hands, juggled the wheel and come into me. Of course there was a wreck then. Q. Where was Mrs. Ward's car when you started to turn across the road? A. On my right-hand side. Q. How far away from your truck on the right-hand side of the road, as you expressed it, was the car when you started to turn across the road? A. I just couldn't give the distance. It wasn't very far. Q. Why didn't you turn over to the right, off the road? A. She would have hit me anyhow and have throwed us over in that gutter and the trees."

On cross-examination this witness said he was driving at around thirty or thirty-two miles an hour, couldn't just say how much faster than thirty miles he was going. But the condition of the bank into which the truck cut after the collision shows that the speed of the truck must have been great. He further said that, when he saw plaintiff over on his side, he tooted his horn and "just touched my brake like and figured on checking up, blowed the horn once or twice, didn't get any move and we got closer. It was time to do something then. Q. Instead of putting on your brakes lightly why didn't you put them on with all the force you had to stop it, if you thought she was going to run into you? A. I figured she would go back across, and just touched it lightly. Q. She did go back across? A. Came into me then."

Frank E. Weddle: "Q. Did you see Mrs. Ward's machine coming up the road? A. Yes, sir; as we got over the knoll we noticed this machine in the middle of the road and the closer we approached the machine the further over on our side of the road it got. Q. What did Mr. Warehime do? A. He tooted the horn and we approached till we got so close there was nothing else to do, as there was a ditch on our side with trees on, * * * which if he had cut down there he would have got thrown over in the gutter and those trees. So the only thing to do was cut to the left to avoid the accident, and when Mr. Warehime cut to the left she cut her front wheel into our right wheel and the impact broke our front wheel down. Q. How long before the accident did you first observe

this machine approaching? A. Well, it wasn't very far, wasn't much time between. Q. Could you see who was driving it? A. I didn't know the woman but I seen there was a woman driving and a man riding. Q. Could you see what they were doing? A. The man was facing the woman and the woman was facing the man. Q. Facing each other? A. Sure. As my man went to make the left turn she wobbled the wheel and throwed up her hands. Q. Did she look up before that? A. I have never seen her look up. Q. She wobbled the wheel as Warehime made the turn? A. Yes, sir; just as he made the left-hand turn. Then her front wheel hit our right front wheel and the impact broke our wheel down. Q. What part of the highway were your front wheels on? A. Well, it was a little over the center, the front wheels. Q. About how close was the car from the truck when you started to cut? A. About twenty or twenty-two feet."

On cross-examination: "Q. Did I understand you to say she was on your right side and then got across the middle of the road? A. Cut from one side, from the cement shoulder, right into us. * * * Her right front wheel hit our right front wheel. She was coming across this way short."

There was testimony on the part of the plaintiff from which the jury could have found that it would have been possible for defendant's driver to avoid the accident by reducing the speed of his truck, turning out on the dirt shoulder to right, and stopping. The weight of the truck with its load of milk was over six tons. The condition of plaintiff's car after the collision was shown by oral testimony and a photograph, and also the condition of the road, fence, and bank, as to marks and breaks.

At the conclusion of the testimony plaintiff offered six prayers and defendant nine. The court granted plaintiff's fifth prayer in connection with defendant's fourth, and also granted plaintiff's sixth prayer, and the defendant's third and fourth prayers, and refused all the other prayers.

This appeal is from the judgment on a verdict in favor of plaintiff.

The only exception is to the ruling of the trial court on the prayers. The reporter is requested to set out all of defendant's prayers, and the granted prayers of plaintiff.

We find no error in the ruling of the court on the prayers.

Appellant makes no point as to plaintiff's granted prayers except as affected by his own demurrer prayers. But he strongly contends that his first, which is a variance prayer (but points out no variance), and his fifth, which is a demurrer to the evidence, and his sixth, which asks for a directed verdict on the ground of contributory negligence, should have been granted. His argument for the demurrer prayer is that the facts are undisputed and susceptible of only one inference. With this we do not agree. The jury was not bound to credit the testimony of defendant's employees as to the way the accident happened, especially as it was quite possible to draw a different conclusion from conditions appearing after the accident, as shown by photographs and oral testimony. For instance, on defendant's theory that plaintiff was on the shoulder of defendant's right side of the road when defendant, at a distance of twenty or twenty-two feet from plaintiff, swerved to the left, the front right wheels of the two vehicles could have come in contact, leaving the left wheels intact, only in one way, namely, by plaintiff's right wheel running into the side of defendant's truck as it was speeding across the road. And yet the jury might have found it difficult to believe that plaintiff's car could have been so completely demolished by such an impact if it believed the testimony offered on behalf of plaintiff that a few seconds before the crash her car was running slowly; or that such a blow from a light car, running slowly, could have broken down the heavy wheel of a truck; and, especially, that it could have driven back the axle of the truck. Again, the position of the car after the accident, pointing towards the south side of the road directly opposite its course immediately before the collision, raises some difficulty on defendant's theory. But, apart from these considerations, there was presented by the evidence the question whether defendant's

servant was justified in turning to the left to avoid an accident when, according to plaintiff's testimony, there was room to pass. on the right, and the further question whether he should not at least have stopped his truck when he discovered that plaintiff was entirely oblivious to her danger. And another important question, whether the unlawful speed at which defendant's servant was driving was the proximate cause of the accident. These were all jury questions. We think *Kelly v. Huber Baking Company,* 145 Md. 321, and *Kaline v. Davidson,* 146 Md. 220, cited by appellant, support this view.

Defendant's sixth and ninth prayers entirely ignore the doctrine of last clear chance, which is applicable to the facts of this case.

His seventh prayer asks for a directed verdict, and is, in effect, a demurrer to the evidence. His eighth predicates a verdict for the defendant on the finding of an unavoidable accident. The facts of this case do not admit of such a finding. Besides, defendant's third prayer, which was granted, fully covers all that could be contended for by defendant on the theory of unavoidable accident.

*Judgment affirmed, with costs to appellee.*